# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| VICKI HALTERMAN o/b/o LARRY E. HALTERMAN | * | CIVIL ACTION NO.  11-0630 |
| VERSUS | * | JUDGE ROBERT G. JAMES |
| MICHAEL J. ASTRUE, COMMISSIONER, SOCIAL SECURITY ADMINISTRATION | * | MAG. JUDGE KAREN L. HAYES |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice**.**

### Background & Procedural History[1]

Larry E. Halterman protectively filed the current application for Title II Disability Insurance Benefits on September 17, 1997.  (Tr. 181-186, 44-46).  He alleged disability as of December 1, 1996, because of numbness in his peripheries, emphysema, his knee giving out, "nerves," and illiteracy.  (Tr. 44, 50).  The claim was denied initially and upon reconsideration. (Tr. 27, 29, 33-36, 38-40, 187-194, 196-198).  Thereafter, Halterman requested and received an August 17, 1998, hearing before an Administrative Law Judge ("ALJ").  (Tr. 199-231).

---

[1]  The court is acquainted with this matter, having considered a prior appeal involving the same claim.  Accordingly, much of the history from the prior decision is recited herein.

However, in a December 14, 1998, written decision, ALJ Raymond Gollmitzer found that Halterman was not disabled under the Act.  (Tr. 10-20).

Halterman unsuccessfully sought review before the Appeals Council, before filing suit in this court on August 3, 2000.  (Tr. 5-6); *Halterman v. Commissioner, Social Security Administration*, Civil Action Number 00-1801 (W.D. La.).  Pursuant to a March 7, 2001, Consent Judgment, the court reversed and remanded the matter for the limited purpose of reevaluating claimant's impairments and obtaining vocational expert testimony, if necessary. (March 7, 2001, Consent Judgment; Tr. 299).  Upon remand from the district court, the Appeals Council vacated the prior administrative decision and remanded the matter to an ALJ for further proceedings.  (Tr. 300-301).

Meanwhile, on July 20, 2000, Halterman filed a new application for Title XVI Supplemental Security Income payments.  (*See*, Tr. 292E).  The state agency apparently granted the new application and awarded Title XVI benefits with an onset date of August 1, 2000.  *Id*. However, additional hearings were held before ALJs Nancy Griswold and Charles Lindsay on June 20, 2001, and March 7, 2002, respectively, in connection with Halterman's still unresolved 1997 applications.  (Tr. 596-628, 582-595).  In a June 18, 2002, partially favorable decision, ALJ Griswold awarded Title XVI benefits to Halterman with a disability onset date of August 1, 2000.  (Tr.  292A-292M).  However, she denied disability for the period prior to August 1, 2000. *Id*.[2]

Halterman sought review before the Appeals Council, but tragically passed away on

---

[2]  The decision effectively denied Halterman's Title II application in its entirely because his eligibility for Title II benefits expired in March 1999.  *Id*.

January 31, 2004, before the review board could act.  (Tr. 330).[3]  On July 31, 2004, the Appeals Council posthumously granted Halterman's request for review, and affirmed the ALJ's decision that he was disabled as of August 1, 2000, but vacated the decision for the period prior to August 1, 2000, and remanded the matter for further consideration.  (Tr. 315-317).

On August 30, 2004, Halterman's sole surviving daughter and heir, Vicki Halterman, substituted as claimant on behalf of her deceased father.  (Tr. 318).  Upon remand, a new hearing was held on June 20, 2005, before ALJ Thomas Bundy.  (Tr. 559-581).  In a February 22, 2006, written decision, ALJ Bundy found that Larry Halterman was not disabled during the relevant period.  (Tr. 487-498).  However, on June 10, 2006, the Appeals Council again assumed jurisdiction and remanded the case for further consideration.  (Tr. 508-512).

On October 26, 2006, ALJ Osly Deramus held a fifth hearing in the matter.  (Tr. 526-558).  In a February 22, 2007, written decision, ALJ Deramus determined that Halterman had not been disabled during the relevant period, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that existed in substantial numbers in the national economy.  (Tr. 245-261).  Vicki Halterman again petitioned the Appeals Council to review the unfavorable decision.  However, on October 26, 2007, the Appeals Council denied the request for review.  (Tr. 232-234).

On January 3, 2008, Vicki Halterman sought review before this court.  *Halterman v. Commissioner, Social Security Administration*, Civil Action Number 08-0004 (W.D. La.). Following briefing by the parties, the undersigned recommended that the court affirm the

---

[3]  The death certificate listed the causes of death as cardiopulmonary arrest; liver failure – end stage liver disease; diabetes mellitus - non-compliant; and urinary tract infection.  (Tr. 330).

3

dismissal of Halterman's Title XVI claim, but that his Title II claim should be reversed and remanded for further proceedings, pursuant to the fourth sentence of 42 U.S.C. § 405(g).  *See* Jan. 30, 2009, Report and Recommendation.  (Tr. 660-677).  On February 23, 2009, the district court entered judgment adopting the report and recommendation.  *See* Feb. 23, 2009, Judgment. (Tr. 659).  Upon remand from the district court, the Appeals Council vacated the prior administrative decision and remanded the matter to an ALJ for further proceedings.  (Tr.  680).

On August 6, 2009, ALJ Bundy held a sixth hearing in the matter.  (Tr.  737-746).  In a November 12, 2009, written decision, he determined that Halterman had not been disabled during the relevant period, finding at step five of the sequential evaluation process that he was able to make an adjustment to work that existed in substantial numbers in the national economy. (Tr.  640-656).

Vicki Halterman petitioned the Appeals Council to review the unfavorable decision. However, on February 24, 2011, the Appeals Council denied the request for review; thus, the ALJ's decision became the final decision of the Commissioner.  (Tr. 629-631).

On April 20, 2011, Vicki Halterman filed the instant complaint for review before this court.  She alleges the following errors,

(1)     the ALJ erred by failing to credit Halterman's alleged disability onset date of December 1, 1996; and

(2)     vocational expert testimony confirmed that there was no work that Halterman could have performed during the relevant period.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa*

*v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## Determination of Disability

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. §

5

423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)    An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2)    An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3)     An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4)    If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5)    If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*,  239 F.3d 698, 704 -705 (5ᵗʰ Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding

6

is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

<u>Analysis</u>

The ultimate issue before the court is the decedent's eligibility for Title II benefits, which requires a finding of disability prior to March 31, 1999, – the date that Larry Halterman was last insured for benefits.  In other words, the relevant disability period extends from December 1, 1996, – the alleged onset date, through March 31, 1999.  *See* Tr. 644.

**I.      <u>Steps One and Two</u>**

The ALJ determined at step one of the sequential evaluation process that Larry Halterman did not engage in substantial gainful activity during the relevant period.  (Tr. 647).  At step two, he found that Halterman suffered severe impairments of chronic obstructive pulmonary disease ("COPD"), diabetes, mellitus with neuropathy, liver dysfunction, borderline intellectual functioning, depression, anxiety, and alcohol abuse.  *Id.*

**II.     <u>Step Three</u>**

At step three, the ALJ determined that prior to the date that he was last insured, Halterman's severe impairments, including substance abuse disorder, met sections 12.06 and 12.09 of 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 648).  However, he further found, that if, during this period, Halterman had ceased substance abuse, then his impairments would not have been severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.  (Tr. 650-653).[4]  Plaintiff does not challenge this determination.

---

[4]  Under the Social Security Act, as amended, an individual will not be considered disabled for purposes of disability insurance benefits if alcoholism or drug addiction was a contributing factor material to the Commissioner's determination that the individual is disabled. 42 U.S.C. § 423(d)(2)(C).  "Drug or alcohol abuse is material to a disability if the ALJ would not 'find [the claimant] disabled if [the claimant] stopped using drugs or alcohol.'" *Brown v. Apfel*,

### III. <u>Residual Functional Capacity</u>

ALJ Bundy next determined that had Halterman stopped substance abuse, he would have enjoyed the residual functional capacity ("RFC") for light work,[5] except that he could but occasionally reach overhead bilaterally, and frequently perform other manipulative functions. (Tr. 653). He also could occasionally use his feet for operation of foot controls, and no more than occasionally climb, stoop, kneel, or crouch. *Id.* Moreover, he could never climb ladders or scaffolds, balance, crawl, or work at protected heights or around moving mechanical parts. *Id.* He also was precluded from operating a motor vehicle, and needed to avoid all exposure to dust, fumes, gases, pulmonary irritants, or temperature extremes. *Id.* However, he could work around occasional wetness or humidity, occasional vibrations, and could tolerate moderate noise exposure. *Id.* He also had markedly limited ability to understand, remember, and carry out complex instructions, and to make judgments on complex work-related decisions. *Id.* He would perform best in a work environment where contact with the public and co-workers was only incidental to the work performed. *Id.*

---

192 F.3d. 492, 499 (5th Cir. 1999) (quoting, 20 C.F.R. § 416.935(b)(1)).

    [5] Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

a)      Physical RFC

Plaintiff couches her challenge to the Commissioner's physical RFC determination as an attack on the Commissioner's onset of disability, and contends that the Commissioner failed to comply with Social Security Ruling 83-20, TITLES II AND XVI: ONSET OF DISABILITY ("SSR 83-20"). Plaintiff effectively contends that the Commissioner erred in settling upon August 1, 2000, as the claimant's disability onset date.[6]

The court emphasizes that "[a] claimant is eligible for benefits only if the onset of disability began on or before the date the claimant was last insured." *Ivy v. Sullivan,* 898 F.2d 1045, 1048 (5th Cir. 1990). The claimant bears the burden of establishing a disabling condition before the expiration of his insured status. *Id.* Social Security Ruling 83-20 outlines the policy and procedure by which the Commissioner should determine the onset date of a disability. SSR 83-20 (1983). "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence." *Id.* With slowly progressive impairments, "it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling." *Spellman v. Shalala*, 1 F.3d 357, 362 (5th Cir. 1997) (quoting, SSR 83-20). In such cases, "when the medical evidence regarding the onset date of a disability is ambiguous and the [Commissioner] must infer  the onset date, SSR 83-20 requires that that inference be based on an informed judgment.  The [Commissioner] cannot make such an inference without the assistance of a medical advisor." *Spellman*, 1 F.3d at 362.

_____

[6]  The Commissioner selected August 1, 2000, as plaintiff's disability onset date for purposes of Halterman's Title XVI claim, – a claim that is not now before the court. Insofar as plaintiff's argument implicates the Title XVI claim, it is foreclosed by this court's prior judgment upholding the dismissal of that claim.  *See* Feb. 23, 2009, Judgment.  (Tr. 659).

Plaintiff stresses that under SSR 83-20, the starting point for determining the appropriate onset date is the claimant's statement as to when the disability began.  (SSR 83-20).  However, the ruling further provides that "[t]he medical evidence serves as the *primary* element in the onset determination."  *Id*. (emphasis added).  Also, the date alleged by the individual should be used only if it is consistent with all the evidence available.  *Id*.  If not, then additional development may be needed to reconcile the discrepancy.  *Id*.  In any event, the ALJ is required to articulate reasons, supported by substantial evidence, for rejecting the claimant's onset date. *Ivy*, 898 F.2d at 1048 (citing *Mills v. Secretary,* No. 82–AR–2268–W, 1988 WL 54673 (N.D. Ala.1988).

Here, the ALJ determined that "the claimant's medically determinable impairments could reasonably have been expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the residual functional capacity assessment . . ." (Tr. 654-655).  In other words, rather than crediting the decedent and his surviving daughter's allegations regarding the disability onset date, the ALJ effectively assigned greater weight to the opinions of the two medical experts, Drs. Felkins and Eppstein who reviewed the instant record following the latest remand.  (Tr. 645,654).  In fact, the ALJ all but adopted the mental and physical medical source statements that Drs. Felkins and Eppstein completed in conjunction with their interrogatory responses.  *See* Tr. 653-654, 707-735.

As recounted earlier, the state agency initially determined that Halterman was disabled as of August 1, 2000, for purposes of his July 20, 2000, Title XVI application.  *See* Tr. 292E.  ALJ Griswold subsequently drafted her June 18, 2002, decision to coincide with the state agency

10

determination, finding that Halterman was disabled as of August 1, 2000, for purposes of his July 17, 1997, Title XVI claim, but not earlier. (Tr. 292A-292M). In so doing, she stressed the significant gap in treatment notes between September 1998 and September 2000. (Tr. 292I). She further noted that on September 19, 2000, Medicine Clinic notes from E.A. Conway Medical Center reflected that Halterman had severe peripheral neuropathy up to his knees and mid-palm. *See* Tr. 468, 292I.[7] Judge Griswold concluded that the minimal medical evidence prior to August 1, 2000, supported a finding that Halterman retained the RFC for a full range of light work, reduced only by an inability to work around high concentrations of dust, fumes, or other pulmonary irritants. (Tr. 292I).

Plaintiff appears to contest the Commissioner's emphasis on a lack of medical treatment records for the period from September 1998 until at least January 2000. However, the Fifth Circuit has recognized that a failure to seek treatment or medication is an indication of non-disability. *Doss v. Barnhart*, 137 F. App'x 689, 690 (5th Cir. June 21, 2005) (unpubl.) (citing *Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990)). To the extent that it could be argued that Halterman did not seek medical treatment during that period because of lack of funds, the court observes that when his condition eventually warranted medical attention in January 2000, Halterman was able to make his way to the emergency room of the local charity hospital. *See* Tr. 403-406.[8] The discharge summary indicates that Halterman had been without medical follow-up

---

[7] Following a September 21, 2000, consultative examination, however, S. I. Courtman, M.D. noted that there was no evidence of peripheral vascular disease, and that complaints of paresthesias of the extremities did not then bother Halterman. (Tr. 409). A chest x-ray showed no significant abnormalities. *Id*.

[8] He later even attended appointments at the medical clinic of the charity hospital. *Id*.

for the past two years, and that he suffered from on and off bilateral leg swelling.  *Id*.  Halterman

reported only occasional leg pain with walking.  *Id*.

       In short, the lack of medical treatment records from September 1998 until at least January

2000, provide a well-demarcated and substantial basis for assigning a different RFC for the

period at issue here, *i.e.* until March 31, 1999.  The issue then is whether the physical RFC for

the relevant period is supported by substantial evidence.

       In addition to testimony from the decedent and his friend(s) and family, plaintiff relies on

medical records from Halterman's treating physicians and a medical expert, Susan Blue, M.D., to

confirm that he actually retained an exertional capacity for less than light work.  For instance, Dr.

Blue, a non-examining neurologist, opined that Halterman was able to stand at least two hours in

an eight hour workday, but apparently not for six hours.[9]  However, this court previously noted a

potential discrepancy with Dr. Blue's opinion because it addressed Halterman's physical RFC

until August 1, 2000, *i.e.* beyond the critical March 31, 1999, date that Halterman was last

insured for Title II benefits.  *See* Jan. 30, 2009, Report and Recommendation.  (Tr. 660-677).

       Upon the latest remand, Judge Bundy clarified that he did not rely upon Dr. Blue's

opinion for the period after March 31, 1999.  (Tr. 645).  In addition, he discounted the

---

     [9]  Dr. Blue completed a Medical Source Statement of Ability to do Work-Related
Activities (Physical).  (Tr. 479-482).  She indicated that from May 11, 1998, to August 1, 2000,
Halterman could occasionally lift 50 pounds, frequently lift 20 pounds, and stand and/or walk *at
least two hours in an eight hour day*.  *Id*.  (emphasis added).  His ability to sit, however, was not
affected by his impairments.  *Id*.  Pushing and pulling were limited by his lifting capacity.  *Id*.
All postural activities were limited to occasional.  *Id*.  Due to his peripheral neuropathy,
Halterman's fine manipulation skills and ability to feel were limited to occasional.  *Id*.  His
pulmonary disease also caused him to experience environmental limitations regarding exposure
to temperature extremes, dust, humidity/wetness, hazardous machinery, and fumes, odors,
chemicals, and gases.  *Id*.

manipulative limitations assigned by Dr. Blue because Dr. Felkins, a non-examining psychiatrist, specifically disagreed with that aspect of Dr. Blue's assessment.  (Tr. 714).  Dr. Felkins noted that Halterman's peripheral neuropathy did not become severe until some time after March 31, 1999.  *Id*.  Prior to that time, however, she did not believe that he had a combination of physical impairments that were disabling.  *Id*.

The court also notes that Dr. Blue based her limitations of functioning on Halterman's pulmonary disease and mild peripheral neuropathy.  (Tr. 482).  As evidence of Halterman's pulmonary disease Dr. Blue cited a May 11, 1998, office note from Allen Spires, M.D.  (Tr. 482, 166).  Dr. Spires noted that diagnostic testing indicated a marked pulmonary impairment.  *Id*.  Despite having seen Halterman on but two occasions, Spires remarked that Halterman was disabled from any type of physical labor because of his advanced chronic lung disease.  (Tr. 166).  Nonetheless, Spires noted that Halterman continued to smoke cigarettes even after he had been urged to cease the unhealthy habit.  *Id*.  Spires added that Halterman could tolerate sedentary work, and that he was an excellent pulmonary rehabilitation candidate.  *Id*.

Four months after his last visit with Dr. Spires, Halterman underwent a pulmonary function study at the request of the state agency.  (Tr. 169-181).  The interpreting physician, Scott Irby, M.D., opined that the test supported a finding consistent with a *mild to moderate* obstructive ventilatory defect.  (Tr. 171) (emphasis added).   When this matter was last before this court, the undersigned remarked that Dr. Irby did not indicate how or whether a mild to moderate obstruction would affect Halterman's ability to work.  *See* Jan. 30, 2009, Report and Recommendation.  (Tr. 660-677).  That ambiguity was resolved on remand, however, because Dr. Eppstein, a non-examining physician with a specialty in internal medicine, specifically

13

considered the September 1998 pulmonary function study (*see* citation to exhibit 18F 5-10 on Tr. 721), but nonetheless opined that Halterman retained the RFC, as ultimately adopted by Judge Bundy. (Tr. 729-735).[10]

In other words, the September 1998 pulmonary function test supports a finding that Halterman's COPD was not as debilitating as Dr. Spires had feared.  In fact, Halterman apparently did not seek further medical intervention until the year 2000.  When he finally did go to the emergency room in January 2000, he complained of dyspnea for the past *two weeks*.  (Tr. 404).  Upon examination, he had moderate air entry and occasional wheezing.  (Tr. 405). Similarly, when S. I. Courtman, M.D. examined Halterman on September 21, 2000, he noted that the chest x-ray showed no significant abnormalities.  (Tr. 409).  Although Dr. Courtman diagnosed intermittent paresthesias and coarse tremors of the extremities typical of alcoholic disease, he did not document any other obvious disabilities.  *Id*.  Halterman told Courtman that his coarse tremors had been present for many *months*.  *Id*.[11]

In addition to the reports/notes from Drs. Blue and Spires, plaintiff notes that Halterman's

---

[10]  Dr. Eppstein indicated that Halterman could sit for six hours, stand for four hours, and walk for four hours in an eight hour workday.  (Tr. 730).  Judge Bundy interpreted this to mean that Halterman could stand and walk for four hours each.  (Tr. 654).  The Appeals Council clarified that this determination translated into a finding that Halterman could be on his feet for a total of eight hours in a normal workday.  (Tr. 629).  This interpretation of Dr. Eppstein's assessment, while not the only possible interpretation, is certainly reasonable and supported by substantial evidence.  Indeed, pursuant to an  October 13, 1997, consultative examination administered by Hayan Orfaly, M.D., Halterman exhibited no motor or sensory deficit, with normal gait and station, and full range of motion for the spine and bilateral upper and lower extremities.  (Tr. 114-116).  Orfaly did not even diagnose any pulmonary disorder, despite Halterman's complaint of dyspnea.  *Id*.  Orfaly concluded that he "would not suggest any specific limitation for his physical activity."  *Id*.

[11]  Obviously, to be relevant to the instant period, the tremors had to have been present for at least 18 months.

14

treating physician, Carter Cox, Jr., M.D. wrote a February 25, 1998, letter to plaintiff's attorney
wherein he documented that he had seen Halterman over the last several years.  (Tr. 129-130).
Cox penned that Halterman's major complaints were shortness of breath and pain in his back.  *Id*.
Physical examination revealed some wheezing in his chest on auscultation.  *Id*.  He had
intermittent swelling of the lower extremities.  *Id*.  His lumbar spine x-rays showed localized
degenerative disc changes in the lower thoracic and upper lumbar spine with disc space
narrowing and osteophyte formation.  *Id*.  His cervical x-ray was in the normal range.  *Id*.  Cox
diagnosed chronic obstructive pulmonary disease and diabetes mellitus controlled by diet and
medication; degenerative arthritis of the lumbar spine with spondylolysis.  *Id*.  Cox cautioned,
however, that he had not seen Halterman since *October 1996*.  *Id*.  (emphasis added).  He opined
that his medical conditions limited him *to some degree* from performing any type of strenuous or
exertional type activity – a condition that was not expected to improve with time.  *Id*.  (emphasis
added).

Whether Dr. Cox intended to limit Halterman to activities at less than the light exertional
level is debatable.  The last time that Dr. Cox actually saw Halterman, which was on October 14,
1996, he issued Halterman a back-to-work slip.  (Tr. 132).  Moreover, Halterman's past relevant
work was performed at the medium exertional level.  Given that Dr. Cox released Halterman to
return to work the last time that he saw him, it is exceedingly unlikely that Cox meant by his
1998 statement that Halterman's exertional capacity was reduced below the level for light work.

The court further notes that in May 1998, several non-examining agency physicians
reviewed Halterman's allegations and the scant medical records, and determined that his physical
impairments were non-severe.  For instance, C. T. Bessent, M.D. reviewed the record on May 27,

15

1998, and noted that although  Halterman had a history of diabetes mellitus, type II, and

hypertension, there was no evidence of end organ damage or further documentation to support a

more objective review of the evidence.  (Tr. 151).  On May 28, 1998, a neurologist, R. Gray

reviewed the record, including Dr. Orfaly's consultative examination and Dr. Cox's February 25,

1998, letter, but opined that Halterman's neurologic impairment and tremors were non-severe.

(Tr. 152).  Similarly, on June 8, 1998, a surgical consultant, John N. Classen, M.D., reviewed the

record and opined that Halterman's musculoskeletal impairments were non-severe.  (Tr. 154).

To sum up, the instant record is replete with opinions from consultative physicians and

non-examining physicians who, for the period at issue, either found no limitations of functioning

stemming from Halterman's alleged physical impairments, or that the impairments caused

limitations not inconsistent with the latest ALJ's RFC.  Certainly, the record contains evidence

that could have supported a more limited RFC.  However, that is not the inquiry before the court.

b)      Mental RFC

Judge Bundy patterned the mental impairment aspect of his RFC (for periods when

Halterman was abstaining from alcohol abuse) after the June 17, 2009, medical source statement

completed by Dr. Felkins.  (Tr. 715-717).  Although the ALJ faithfully incorporated all of the

limitations indicated by Dr. Felkins, plaintiff nonetheless maintains that he erred by failing to

include moderate difficulties in maintaining concentration, persistence, or pace, that the ALJ

documented as part of the psychiatric review technique ("PRT") at steps two and  three of the

sequential evaluation process.  In support her argument, plaintiff cites to decisions from other

16

circuits.  *See e.g.*, *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176 (11th Cir. 2011).[12]

In this case, Judge Bundy ultimately derived his finding that Halterman experienced moderate difficulties in maintaining concentration, persistence, or pace from a December 9, 1997, mental status examination and intelligence test administered by E. H. Baker, Ph.D.  (Tr. 117-119).  Dr. Baker observed that Halterman's understanding and memory were intact.  *Id*. Furthermore, his sustained concentration and social interaction, were adequate.  *Id*.  His persistence was good.  *Id*.  However, Halterman appeared to experience difficulties with social abilities in less structured settings.  *Id*.  Adaptation was marginal, and prognosis was guarded.  *Id*. Baker opined that he was able to work at simple jobs with appropriate supervision.  *Id*. However, he would have difficulty learning new tasks because of his limited cognitive ability and his inability to read.  *Id*.  His depression and anxiety prevented him from working adequately in a public setting.  *Id*.  Baker added that Halterman would have difficulty working with peers.  *Id*.

Relying upon Dr. Baker's mental status examination two out of three non-examining agency psychologists/psychiatrists, who initially reviewed the record, found that Halterman's mental impairments resulted in functional limitations.[13]  On March 18, 1998, Webb Sentell, M.D., completed a Mental Residual Functional Capacity Assessment.  (Tr. 133-136).  He indicated that Halterman suffered moderate limitations in his ability to: understand, remember,

---

[12]   In *Winschel*, the court indicated that unless the medical evidence suggested that the claimant's ability to work was unaffected by the moderate limitation that the Commissioner recognized in the PRT, or otherwise implicitly accounted for in the hypothetical to the vocational expert at step five of the sequential evaluation process, then the ALJ's finding of not disabled is not supported by substantial evidence.  *Id*.

[13]   The third psychologist, Jack L. Spurrier, Ed.D., found that Halterman's mental impairments were not severe.  (Tr. 120-128).

and carry out *detailed* instructions; maintain attention and concentration for extended periods; and to set realistic goals or make plans independently of others. *Id*. Importantly, however, he found no significant limitations with Halterman's ability to carry out short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; and to make simple work-related decisions. *Id*.

On May 21, 1998, Arron Suans, M.D., completed a Mental Residual Functional Capacity Assessment. (Tr. 137-141). He indicated that Halterman was moderately limited in his ability to: understand, remember, and carry out *detailed* instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions or to perform at a consistent pace without unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from superiors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. *Id*.[14] Dr. Suans explained, however, that Halterman's ability for sustained concentration and persistence would be but "minimally limited" as a result of his mental impairments. (Tr. 141).

Dr. Felkins completed a different SSA form than the other two non-examining mental health professionals; it was entitled Medical Source Statement of Ability to do Work-Related

---

[14]  Sentell and Suans also completed psychiatric review technique forms which confirmed that Halterman's mental impairments were severe. (Tr. 142-150, 155-163).

18

Activities (Mental).  (Tr.  715-717).  This form did not include specific questions regarding

sustained concentration and pace.  *Id*.  Nonetheless, the form inquired whether any of the

claimant's other capabilities were affected by the impairment. *Id*.  Felkins indicated "no."  *Id*.

  In sum, the court finds that the record contains substantial evidence to support the ALJ's

mental RFC.  The undersigned adds that the purpose of the PRT is to determine whether there is

a severe mental impairment at step two of the sequential evaluation process, and then whether

that mental impairment is severe enough to meet or equal a listing at step three.  Although the

instant ALJ found that Halterman's impairments moderately affected his ability to maintain

concentration, persistence, or pace – thus, satisfying the criteria for a severe, but not per se

disabling impairment, the record also contains substantial evidence to support the ALJ's implicit

finding that the moderate limitation did not impact Halterman's ability to perform simple,

unskilled work.

## III.  <u>Steps Four and Five</u>

  Judge Bundy concluded at step four of the sequential evaluation process that Halterman

could not perform his past relevant work.  (Tr. 655).  Accordingly, he proceeded to step five.  At

this step, the ALJ determined that Halterman was a younger individual, functionally illiterate,

and that transferability of skills was immaterial.  *Id*.  He observed that given Halterman's

vocational factors, and if he were capable of the full range of light work, the Medical-Vocational

Guidelines would direct a finding of not disabled.  20 C.F.R. § 404.1569; Rule 202.18, Table 2,

Appendix 2, Subpart P, Regulations No. 4.  (Tr. 656).[15]  However, because Halterman's residual

functional capacity did not permit him to perform the full range of light work, the ALJ consulted

---

[15]  The same result obtains under Rule 202.16.

a vocational expert ("VE") to determine the extent that his additional limitations eroded the occupational base for unskilled light work.  In response, the VE identified the representative job of housekeeper, motel, *Dictionary of Occupational Titles* ("DOT") Code # 323.687-014 that was consistent with the ALJ's RFC and Halterman's vocational profile.[16]

Plaintiff proffers several challenges to the ALJ's step five determination on the grounds that his hypothetical(s) to the VE failed to include additional limitations that she contends were warranted by the record.  However, a hypothetical need only reasonably incorporate the disabilities and limitations recognized by the ALJ.  *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994).  Here, the ALJ's hypothetical(s) to the VE substantially incorporated the limitations that the ALJ credited in his RFC, and that assessment is supported by substantial evidence.  *See* discussion, *supra*.

Plaintiff raises two additional arguments not otherwise subsumed within the court's review of the sufficiency of the RFC.  The first argument stems from the testimony of a VE at an earlier 2006 hearing, who opined, that for the same job identified by the latest VE, standing and/or walking would be required for the full eight hours per work day.  (Tr. 553-556).  Of course, the current VE testified that a hypothetical claimant with the RFC to "[s]it six in eight, stand four in eight, walk four in eight . . ." was able to perform the housekeeper/motel job.  (Tr. 740).  These two opinions are not necessarily inconsistent with one another because the RFC reflects an ability for the claimant to remain on his feet for a total of eight hours per work day.

---

[16]  The VE testified that there were 244,243 such jobs in the national economy and 4,261 jobs in Louisiana.  (Tr. 656, 740).  This incidence of jobs constitutes a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

*See* discussion, *supra*.

Plaintiff further argues that because the ALJ's physical RFC (as endorsed by Dr. Eppstein), restricted Halterman from any exposure to dust, odors, fumes, and pulmonary irritants, it stands to reason that Halterman could not have performed the job of hotel cleaner, as this job would have required him to work with soaps, cleansers, disinfectants, and the like.  However, upon questioning by plaintiff's counsel, the VE clarified that someone with respiratory problems would not be precluded from performing the representative housekeeper/motel job.  (Tr. 744).[17] The VE's testimony was consistent with the DOT.  *See* Tr. 743-744.

### Conclusion

The ALJ in this case was tasked with determining whether Halterman was disabled during the relevant period.  In so doing, he considered the lay testimony, the medical record, and expert opinion evidence.  The evidence was not uniform and could have supported a different outcome.[18]  However, conflicts in the evidence are for the Commissioner to resolve.  *Selders v.*

---

[17]  Plaintiff also pounces upon the ALJ's misstatement that exposure to soap would not have affected Halterman's ability to work because he formerly worked as a hotel cleaner.  (Tr. 654).  This mis-characterization of Halterman's prior work did not materially impact the ALJ's decision, however, because he employed it as a potential basis to discount Dr. Eppstein's environmental limitations that he ended up adopting anyway.  *Id*.  Moreover, Halterman did have some prior work experience in laundry at an apparel shop.  (Tr. 538).  In short, the ALJ's misstatement was harmless.  *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (procedural perfection in administrative proceedings is not required); *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights).

[18]  Albeit, at least four different ALJs have determined that Halterman was not disabled for the relevant period.  The Appeals Council also upheld findings of not disabled on at least three occasions.  While this court has remanded this matter twice before (once by consent of the parties), the undersigned is satisfied that the Commissioner's latest effort is supported by substantial evidence.  The court echos Judge Bundy's commendation to counsel for his persistence and fine representation throughout this matter's convoluted journey through the

*Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra*.[19]  That is not to say that the ALJ's decision is blemish-free, but procedural perfection in the administrative process is not required, and any errors do not undermine confidence in the decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination that Halterman was not disabled under the Social Security Act for the relevant period, is supported by substantial evidence and remains free of legal error.  Accordingly,

**IT IS RECOMMENDED** that the Commissioner's decision be **AFFIRMED**, in its entirety, and that this civil action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of

---

administrative and judicial process.

[19]  Admittedly, this court has expanded upon some of the reasoning given by the Commissioner for his decision.  Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below."  *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted).  One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result.  *Id.*  This exception is applicable here.  Further, the Fifth Circuit implicitly has sanctioned the federal courts' practice of assigning independent reasons for discounting newly adduced evidence.  *See e.g.,  Foster v. Astrue*, 2011 WL 480036 (5th Cir. Feb. 10, 2011) (unpubl.); *Garth v. Astrue*, 393 Fed. Appx. 196 (5th Cir. Aug. 26, 2010) (unpubl.).

filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, at Monroe, Louisiana, this 20th day of July 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE